## RUGGLES–COLES ENGINEERING CO. v. McGANN ENGINEERING CO., Inc., et al.

District Court, M. D. Pennsylvania. August 24, 1929.

No. 403.

**520**

Schmidt, Keesey, Stair & Kurtz, of York, Pa., and Mayor, Warfield & Watson, of New York City, for plaintiff.

Winter, Brown & Critchlow, of Pittsburgh, Pa., and Ray P. Sherwood, of York, Pa., for defendants.

JOHNSON, District Judge. The bill of complaint charges the defendants with the infringement of letters patent No. 1,229,978, issued to William J. Kuntz on June 12, 1917, for an improvement in drier heads, and assigned by him on June 22, 1920, to the Ruggles-Coles Engineering Company, plaintiff, and prays for an injunction and an accounting.

In their answer the defendants deny the plaintiff's title to the patent in question and deny infringement. On the pleadings and evidence, three questions arise for disposition:

First, the title to the patent in suit; secondly, infringement; and, thirdly, if there was infringement, the liability of McGann and Kuntz, as individuals.

First, the title to letters patent No. 1,229,978. The defendants, McGann and Kuntz, were for many years officers and employees of the plaintiff company. In 1922, they formed the McGann Manufacturing Company, Inc., which company immediately began to manufacture and sell driers which the plaintiff claims constituted infringement of the patent in suit.

The subject-matter of the patent in suit was invented by defendant Kuntz in 1916 or 1917, while he was an officer and employee of the plaintiff company.

On June 22, 1920, Kuntz assigned the letters patent in suit to the plaintiff company, under the following circumstances: Late in 1919, while an officer and employee of the plaintiff company, Kuntz was authorized to act as agent of H. W. Hardinge to purchase a controlling interest of stock in the Steacy-Schmidt Manufacturing Company and in the Ruggles-Coles Engineering Company, of which latter company Kuntz was then vice president and general manager. Kuntz exhibited to Hardinge what purported to be an option from the York Trust Company, trustee and agent of the said companies, to purchase the said stock in the two above-named companies for a consideration of $298,162.50. To secure for Hardinge control of the Ruggles-Coles Engineering Company, Kuntz agreed to sell 38 shares of his own stock in that company at the same price per share. The total price to be paid by Hardinge for the controlling interest of stock in these two companies was $303,387.50. The option was exercised in January, 1920, and the stock was presented to Hardinge, who paid approximately $150,000 in cash and gave three promissory notes of $50,000 each with the stock itself as collateral security.

In June, 1920, Hardinge and his associates became suspicious of this transaction, and a conference was held in York, Pa., on June 19, 1920, into which Kuntz was called and charged with having made a secret profit on the transaction. Kuntz denied this charge and left the conference after having been advised to see counsel.

Early in the morning of June 21, 1920, Kuntz came into the office of the company in York and commenced a recital to William T. Baker, president of the plaintiff company, of his part in the purchase of the two companies by Hardinge. At Baker's suggestion, they called at the office of George T. Schmidt, counsel for the company, where Kuntz signed a written statement of the stock transaction. In this statement Kuntz admitted that the option which he had shown

to Hardinge had been forged, and that the genuine option for the purchase of the stock had been secured and exercised with the financial assistance of Robert G. McGann for the sum of $142,975, and that the profit made on the transaction by him and McGann amounted to $155,187.50. The profits made on this transaction were divided between Kuntz and McGann, Kuntz taking two of the $50,000 notes and McGann one. Kuntz agreed to return to Hardinge the two notes in his possession and also to turn over to him certain assets to protect him against loss in the event that the $50,000 note given to McGann would have to be paid. There appears to have been a verbal understanding that the cash value of any assets thus turned over would be set off against the losses incurred by Hardinge, and in the event that any balance should remain in Kuntz's favor, it would be returned to him.

As a result of the suit brought by Hardinge to obtain possession of the $50,000 note given to McGann and the stock which he put up as collateral, Hardinge was compelled to pay the note which McGann had received.

In the last paragraph of the typewritten statement signed by Kuntz, he agreed "to forthwith assign, transfer and set over unto the Ruggles-Coles Engineering Company, certain Letters Patent of the United States on an improvement in Drier Heads, which were issued to and stand in my name."

It is the contention of the defendant Kuntz that this transfer was made under duress and that the title of the patent was to be held in trust by Hardinge, as security in the event that Hardinge should be obliged to pay the $50,000 note given to McGann. There is no evidence in the case to warrant the conclusion that Kuntz acted under duress when he assigned the patent to the Ruggles-Coles Engineering Company, except the unsupported testimony of Kuntz himself. His testimony is contradicted by at least three reputable witnesses for the plaintiff. Nor do the circumstances support the defense of duress and trusteeship. During the 3½ years which elapsed between the assignment of this patent and the claim made in this suit that he was acting under duress, Kuntz never claimed or charged that he was acting under duress at the time of the assignment of the patent. In the suit brought by Hardinge against Kuntz, the York Trust Company, and Robert G. McGann to recover the $50,000 note given to McGann and the stock which he had put up as collateral, Kuntz not only permitted a decree pro confesso to be taken against him, but he took the witness stand and described in detail the entire stock transfer, and nowhere in his testimony did he state or claim that the assignment in question was made under duress and that his property had been turned over to Hardinge in trust.

The testimony and circumstances in this case fail to support the contention of the defendants that the assignment of the patent in suit was made under duress, and that it was held in trust by Hardinge; but, on the other hand, it supports the contention of the plaintiff that it was voluntarily assigned to the plaintiff company and that the title to the patent belongs to the plaintiff company.

Next, is the question of infringement: The patent in suit covers an improvement in driers and relates more particularly to improvements in the feed heads of driers of that type including rotating drying shells, a stationary feed head, and forced draft means through the shells and the feed heads. The invention was made by the defendant Kuntz while he was employed by the plaintiff company and was designed to overcome certain disadvantages in the Ruggles drier, and more particularly the drier covered by Ruggles patent, No. 1,105,927, which was then in use by the plaintiff company.

The defendant admits the manufacture and sale of three slightly different types of driers, as shown in Plaintiff's Exhibits Nos. 3, 4, and 5, designed respectively as the "Carbide" "Standard," and "Crescent" types of feed heads for driers. One machine each of the "Carbide" and "Crescent" types have been made and sold by the defendants. Defendants have manufactured and sold approximately twenty machines of the "Standard" type. They admit that one machine of the "Carbide" type made and sold by them infringes the first five claims of the patent in suit, but deny that it infringes claim 6. They deny the infringement of any claim of the patent in suit by either their "Standard" or "Crescent" types of drier.

There are eight claims in the patent in suit, of which the first six claims are alleged to have been infringed. Claim 1 of the patent in suit recites a combination of features or elements, as follows: "In a drier, a feed head having an internal cylindrical shell, a drying drum having an inner shell, an extension secured to said inner shell of the drum and projecting into the feed head at one side and into the said cylindrical shell thereof and a gas conveying flue leading into to the opposite side of the feed head and into said shell extension."

Every element of claim 1 of the patent in suit can be read directly upon the defendants' structure with the exception of "having an internal cylindrical shell."

The use of this inner cylindrical shell was one of the contributions of the patent in suit to the art. One of the disadvantages found in Ruggles patent, No. 1,105,927, upon which the patent in suit was an improvement, was that there was a tendency for the hot gases to short-circuit at the juncture between the stationary flue and the rotating "extension" which was carried by the "inner shell." This tendency to short-circuit the hot gases was minimized in the patent in suit by providing a stationary "interior shell" of substantial length marked 27 on the drawings in the letters patent in suit, which encircles for nearly its full length the juncture between the stationary flue, marked 13, which causes the hot gases to follow "an abruptly tortuous path," and which further causes them to go through the inner shell, marked 10.

This inner cylindrical shell of the patent is attached to the inner face of the vertical wall of the feed heads. In place of this inner cylindrical shell, the defendants have used in their structure a sleeve mounted to the stationary fuel conveying flue so as to co-operate with said stationary flue and the revolving inner shell. This change is one which could be made by any one exercising ordinary mechanical skill, and it produces no change of function and no difference in the mode of operation.

Defendants' position, as stated on page 24 of defendants' brief, is that the inner shell, 27, of the feed head of the patent in suit, is illustrated, described, intended to be, and patented as an integral part of the complete feed head, and that therefore the sleeve substituted by the defendants is not a mechanical equivalent.

■ There is nothing in the prior art or in the claims and specifications of the patent which limits the patent to such a construction. The patent shows one form, presumably the best form, in which the invention can be embodied; but the patentee is entitled to protection on all forms which embody the substance of his invention.

It is clear that the defendants have infringed claim 1 of the patent in suit.

Claim 2 of the patent repeats word for word the language of claim 1, with the additional elements, "the feed head having an enlarged opening around the said flue to admit air between the same and the said extensions and into the inner shell of the drum." Every element of claim 2 can be read upon defendants' machine, and it is clear that claim 2 of the patent in suit has been infringed.

Claim 3 of the patent in suit has the following combination of elements: "In a drier a drum having inner and outer shells, a feed head having an inner shell into which the inner shell of the drum extends, and a plate around the lower portion of the feed head between the same and the inner shell thereof, to prevent the entrance of material into the feed head from the lower portion of the adjacent end of the outer shell of the drum."

The "back-spill plate," which is the new element of claim 3, is a distinct advance over the prior art, although the step taken is not large, in that the patent in suit is the first in which such a plate is provided. Defendants' structure has such a plate, differing only slightly from that of the patent in suit. The infringement of claim 3 is clear, since every element of the claim can be read upon defendants' machine.

Claim 4 repeats word for word the language of claim 3, and adds, "and a feed chute extending angularly through the feed head at one side of the said shell thereof."

The infringement of claim 4 is clear, since every element of the claim can be read upon the defendants' machine.

Claim 5 repeats word for word the language of claim 4, and adds, "said feed chute consisting of a feed hopper and a feed plate, the latter of which is secured at its lower inner end to one end of the said lower plate of the feed head."

The infringement of claim 5 is clear, since every element of the claim can be read upon the defendants' machine.

Claim 6 of the patent in suit covers the following combination of elements: "In a drier, a drum having inner and outer shells, a feed head into which the inner shell extends, having a flanged opening of a diameter less than that of the outer shell, a bearing band externally of the feed head and around the flange of said opening, and a sealing ring around and engaging said band and secured to the said outer shell."

Claim 6 of the patent in suit covers a "blocking device" or "seal" designed to prevent any escape of the dust-laden hot gases. It consists of two coacting members, namely: (1) A stationary bearing band 20, and (2) an inwardly-projecting sealing ring carried upon the interior surface of said drum-shell, 11, and itself carrying adjustably a cylindrical portion, 21, which fits around said bearing band 20.

The sealing device used by defendants on all three types of driers is specifically different from the above-described sealing device of the patent in suit. It is the contention of the plaintiff, however, that the defendants' "semi-seal" is the mechanical equivalent of the "seal" of the patent in suit.

Defendants' construction comprises two rings or discs placed on edge in parallel relation to each other, with another edgewise disposed parallel ring or disc between the two freely positioned not necessarily in contact with either of the other two discs, and so that the single ring between the others may rotate and may contact with either ring or it may be out of contact with both of them.

Seals of the same type and general arrangement as that used by the defendants were old in the art long prior to the patent in suit. They operated to seal the openings between the rotating shell and the parts of the head with which the rotary shell engaged. They did not perform the function of "preventing any escape of the dust-laden hot gases," as did the "seal" of the patent in suit. In view of the crowded state of the art, the patentee is entitled only to protection against the use of the particular type of sealing device shown in the patent in suit, and therefore claim 6 is not infringed by any of defendants' three types of driers.

As to the "Crescent" type of defendants' machine, the evidence shows that this type does not have the inner shell, nor does it show that any equivalent element has been substituted in place of this inner shell, and therefore the evidence does not show that the defendants' "Crescent" type of drier infringed the plaintiff's patent.

The remaining question in this suit now presents itself: The liability of Kuntz and McGann personally. Both Kuntz and McGann were for many years connected with the plaintiff company. After leaving the company, they organized the McGann Manufacturing Company, with themselves as a majority of the stockholders. They were both thoroughly familiar with the patent in suit, the invention of Kuntz, and as officers of the defendant company they willfully and knowingly participated in the defendant company's manufacture and sale of infringing machines. They are both, therefore, personally liable jointly with the McGann Manufacturing Company, Inc. Dangler v. Imperial Machine Co. (C. C. A.) 11 F.(2d) 945.

And now, August 24, 1929, it follows that defendants' "Carbide" and "Standard" types of feed heads infringe claims 1, 2, 3, 4, and 5 of the patent in suit, and a decree for an injunction, reference, accounting, and costs may be prepared in accordance with this opinion.